# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

RICHARD TOMLINSON,

        Plaintiff,

v.

        **MEMORANDUM OF LAW & ORDER**
        Civil File No. 12-2030 (MJD/TNL)

J.B. HUNT TRANSPORT, INC.,

        Defendant.

Clayton D. Halunen and Jacob Frey, Halunen & Associates, and Michelle Dye Neumann, Brian T. Rochel, and Phillip M. Kitzer, Schaefer Law Firm LLC, Counsel for Plaintiff.

George R. Wood, Littler Mendelson, PC, Counsel for Defendant.

## I.    INTRODUCTION

This matter is before the Court on Defendant's Motion for Summary Judgment [Docket No. 40] and Plaintiff's Motion to Strike Declaration of Wesley Griffin [Docket No. 48].  The Court heard oral argument on October 4, 2013.  Because genuine issues of material fact exist, the Court denies summary judgment on Plaintiff's workers' compensation claim.  Because Plaintiff cannot show that he was disabled at the time he was fired, the Court grants summary

judgment on Plaintiff's disability discrimination claim.  The motion to strike is denied.

## II.    BACKGROUND

### A.    Factual Background

#### 1.    The Parties

In August 2009, Plaintiff Richard Tomlinson began working as a driver for Defendant J.B. Hunt Transport, Inc. ("J.B. Hunt"), a transportation logistics company incorporated in Georgia and headquartered in Arkansas.  (Kitzer Decl., Tomlinson Dep. 20; Griffin Decl. ¶ 2, filed in <u>Johnson v. J.B. Hunt Transport, Inc.</u>, Civil File No. 12-2031 (MJD/TNL).)  Tomlinson worked as a driver for J.B. Hunt at its Roseville, Minnesota, facility until March 9, 2012.  (Tomlinson Dep. 16, 20-21, 127.)

As a driver for J.B. Hunt, Tomlinson delivered and installed appliances in homes and businesses.  (Tomlinson Dep. 13-14, 21.)  He reported to Account Manager Jeffrey Henning.  (<u>Id.</u> 21.)  There were also two office managers, Ben Sanders and Dean Willar, who reported to Henning.  (<u>Id.</u> 21-22.)  When Henning was not available, Tomlinson was directed to contact Sanders or Willar.  (<u>Id.</u> 22.)

## 2. J.B. Hunt's Workers' Compensation Procedures

J.B. Hunt's policy is that when a driver is injured while working, the driver

must immediately report the incident to J.B. Hunt's Corporate Claims

Department by telephone.  (Kitzer Decl., Hill Dep. 18-20; Griffin Decl., Ex. 1, J.B.

Hunt 2009 Driver Manual at 71.)  The Corporate Claims Department asks the

driver whether he or she requires medical treatment and whether he or she

would like to file a workers' compensation claim.  (Hill Dep. 19-20.)  If the

employee decides to file a workers' compensation claim, the claim is

administered by J.B. Hunt's workers' compensation coverage carrier.  (Id. 14.)

J.B. Hunt employs three claims examiners who are liaisons between J.B. Hunt

and its insurance carrier.  (Id. 14-15, 21-22.)  The claims examiner responsible for

the claims arising out of J.B. Hunt's Roseville location is Christina Hill.  (Id. 99.)

## 3. J.B. Hunt's Leave Policy

According to J.B. Hunt's written leave policy: "If an employee cannot

return to work at the end of the FMLA leave because of the employee's

incapacity and/or because no reasonable accommodation is available, [J.B. Hunt]

may grant the employee a Personal Medical leave of up to 6 weeks."  (Wood

Decl., Ex. A, Tomlinson Dep., Ex. 2, J.B. Hunt Leave Policy at 7.)  According to

J.B. Hunt's 2009 Driver Manual, "Personal leave in excess of 6 weeks is not available." (Griffin Decl., Ex. 1, J.B. Hunt 2009 Driver Manual at 24.) Tomlinson received a copy of J.B. Hunt's leave policy and understood that, between FMLA leave and personal leave, he was entitled to a maximum of 18 weeks of medical leave. (Tomlinson Dep. 25-28.) J.B. Hunt Litigation Director, Wesley Griffin, avers that J.B. Hunt's practice is that, if, at the end of the personal medical leave, the employee cannot return to his position within a reasonable period, J.B. Hunt discharges him, unless a position within his restrictions is available. (Griffin Decl. ¶ 8.) Also, "if the employee has presented a doctor's certification indicating that he or she will be able to return to work within a reasonable time period, additional leave time may be granted." (Id.)

According to Defendant's 2009 Driver Manual, when a driver is out of work due to an injury, that employee cannot drive again until the Corporate Claims Department has received a release from the treating doctor that the driver can drive, load, and unload with no restrictions. (J.B. Hunt 2009 Driver Manual at 71.) Hill testified that claims specialists' practice is that, if a driver has restrictions that prevent him from performing the essential functions of a driver job, the claims specialist contacts the driver's supervisor and asks if the

4

supervisor has any modified duty work at his location that may be performed by

the driver within his restrictions.  (Hill Dep. 23-28.)  Hill testified that the

decision of whether or not there is light duty work available for a restricted

employee is left up entirely to the supervisor.  (Id. 26.)  She further testified that,

under J.B. Hunt policy, light duty assignments may not exceed six months per

injury.  (Id. 33-34.)

The supervisor does not follow any particular criteria in deciding if light

duty work is available but is directed to "use the employee's restrictions as a

guide."  (Id. 27-28; see also Henning Dep. 15, 21 (testifying that, if someone from

the workers' compensation department asks him if he has light duty work

available for an injured employee, he had discretion to determine whether light

duty work is available to be given to an employee, but that he is not aware of any

objective criteria to guide his determination).)  Henning testified that he had

never attempted to find light duty work for an employee when asked by the

employee, as opposed to the workers' compensation department, nor has he ever

advocated for light duty for an employee.  (Henning Dep. 16, 22, 82-83.  But see

Henning Dep. 83-85; Kitzer Decl., Ex. 4, Feb. 26, 2010 Email from Henning to Hill

("Do you know anything about getting Richard Tomlinson in for light duty?

This guy really wants to stay here and recover so that he can get back to normal duty.  We can certainly find work for him within his restrictions.  Any help you can offer is greatly appreciated!").)

### 4.    Tomlinson's First Injury

On Thursday, October 29, 2009, while Tomlinson was unloading appliances, he was hit in the right elbow by a portable truck ramp.  (Tomlinson Dep. 29, 37-38.)  After Tomlinson finished unloading the appliances, he contacted Henning to report the injury to his elbow and shoulder.  (Id. 38-39.)  Henning told him to keep working and let him know how it felt as the day went on.  (Id. 39.)  Tomlinson then continued working and his elbow swelled up and his shoulder became sore.  (Id. 40.)  He called the office and told Willar that "everything was going okay, people were helping [him], customers were helping [him] if [he] needed it."  (Id. 41.)

On October 30, Tomlinson showed Sanders his swollen elbow.  (Tomlinson Dep. 43.)  Sanders told Tomlinson that, if it were up to Sanders he would send Tomlinson to a doctor, but ultimately it was up to Henning.  (Id. 43.)  Tomlinson showed his elbow to Henning, which had a golf-ball-sized abscess.  (Id. 43-44.)

Henning told Tomlinson to go to work because there was no one else to cover the route and, hopefully, it would get better over the weekend.  (Id. 43-44.)

Tomlinson reported his injury to J.B. Hunt's safety department on October 29 or October 30.  (Tomlinson Dep. 48.)  He told J.B. Hunt that he thought he would need medical attention.  (Id. 49.)  By November 2, he had filed a first report of injury seeking workers' compensation benefits.  (Id. 30; Kitzer Decl., Ex. 2.)

On Monday, November 2, Tomlinson went into work and showed Henning his elbow; Henning sent him to an urgent care clinic to see the doctor. (Tomlinson Dep. 53-55, 59.)  Henning was upset that Tomlinson was not going to be doing his route that day.  (Id. 55.)

The doctor at the clinic diagnosed Tomlinson with a broken bursa sac in his right elbow.  (Tomlinson Dep. 59-60.)  The doctor drained the bursa sac and gave Tomlinson a cortisone shot.  (Id.)  The doctor directed Tomlinson to take two weeks off from work.  (Id. 61.)

Tomlinson returned to the office and showed Henning the form from the doctor requesting two weeks off from work.  (Tomlinson Dep. 62.)  Henning was upset that Tomlinson would miss work and stated that he could not afford to

have Tomlinson out.  (Id. 62.)  Henning called his manager, Justin Thomas.  (Id.

62-63.)  Henning told Thomas that Tomlinson needed two weeks off work and

that Henning could not afford to have Tomlinson off.  (Id. 63.)  He also told

Thomas that the cortisone shot should make Tomlinson feel better and that he

should go back to the clinic and request that the doctor say that he was able to

work.  (Id.)  After that conversation, Henning told Tomlinson that "you will

make way less money if you're out on workmen's comp, we can't afford to be

without you, so we want you to go back to see Dr. Wolfe."  (Id. 64.)

So, November 3, Tomlinson returned to the doctor and asked to be

released to work.  (Tomlinson Dep. 66.)  The doctor told him that the cortisone

shot made him feel good but that did not mean that it was healed; reluctantly,

the doctor released him for work.  (Id.)

Tomlinson returned to work as a driver.  Each morning he would tell the

managers that his injury felt good in the morning, and at the end of the day he

would tell them that it was pretty sore.  (Tomlinson Dep. 68.)  On November 18,

he complained to Willar that his elbow and shoulder hurt too much and he

needed a helper to keep working.  (Id. 69.)  J.B. Hunt gave him a helper so that he

did not have to do any unloading.  (Id. 69-70.)

8

On November 23, 2009, Tomlinson returned to the doctor because his elbow was worse.  (Tomlinson Dep. 71.)  The doctor drained his elbow, gave him another cortisone shot, told him that he should have taken the two weeks off before, ordered him to see a surgeon, and told him not to return to work until he had seen the surgeon.  (Id. 72.)  Tomlinson told Henning that he could not work, and Henning stated that J.B. Hunt could not be without Tomlinson.  (Id.) Tomlinson replied that he simply could not do the job.  (Id.)

On November 23, 2009, Tomlinson went on leave.  (Tomlinson Dep. 73.) On November 30, Tomlinson saw an orthopedic surgeon, and his surgery was scheduled for December 16, 2009.  (Id. 75, 77.)  Tomlinson underwent elbow surgery on December 16, 2009 and was on FMLA leave until March 1, 2010. (Id. 78, 89.)

On February 26, 2010, Henning contacted Hill and wrote:

> Do you know anything about getting Richard Tomlinson in for light duty?  This guy really wants to stay here and recover so that he can get back to normal duty.  We can certainly find work for him within his restrictions.
>
> Any help you can offer is greatly appreciated.

(Kitzer Decl., Ex. 4.)

Starting March 1, 2010, Tomlinson was given light duty work, primarily

assisting with dispatching, and then was permitted to exceed the six-month cap

for light duty.  (Henning Dep. 92; Tomlinson Dep. 89-90, 93-94; Kitzer Decl., Ex.

3.)  He worked in the light duty position until the end of January 2011, with a

short medical absence for surgery on his wrist and shoulder from March 17, 2010

through mid-April 2010.  (Tomlinson Dep. 85-94.)  J.B. Hunt asserts that it was

due to a clerical error that Tomlinson was permitted to stay in the light duty

position for approximately ten months.  (Hill Dep. 37.)  On January 28, 2011,

when Henning told Tomlinson that he had not realized that he was not supposed

to still be on light duty, Tomlinson was put back on medical leave.  (Tomlinson

Dep. 94-95.)

On March 21, 2011, Henning wrote to Thomas again seeking to find a light

duty position for Tomlinson at J.B. Hunt:

> Gary [Tomlinson] is coming up on the date that he needs to be
> employed or he loses his unemployment.  The date is 4/2.  He has
> received a couple of offers from outside the company, but really
> doesn't want to leave.  Is there any chance that we get that position
> through before 4/2?  I'd be the first one to tell you that we don't need
> the B.S. immediately, but we will, and I don't want to lose Gary in
> the mean time.  Can you think of any alternatives?  Any where else
> we could put him in the mean time?  Would he perhaps be able to
> drive for dray?

> I know this is a tough spot, but Gary has taken care of this location and J.B. Hunt as a company in the past.  He's not milking his WC.  He wants back to work in a bad way and he wants to be productive, too.  He doesn't want to continue to leach off the company.

(Kitzer Decl., Ex. 5.)

Tomlinson returned to his driving position on April 15, 2011, subject to a 60-pound overhead lifting restriction.  (Tomlinson Dep. 95-99; Kitzer Decl., Ex. 8.)  He worked full time from April 13, 2011 through January 17, 2012.  (Tomlinson Dep. 106-09.)

Although Hill knew of Tomlinson's 60-pound overhead lifting restriction, in April 2011, she told Henning that Tomlinson did not have any restrictions because, with both hands, he was still able to lift 60 pounds overhead and that was within J.B. Hunt's guidelines.  (Hill Dep. 47-48; Kitzer Decl., Ex. 8; Tomlinson Dep. 97.)  In Henning's opinion, a 60-pound overhead restriction would have interfered with a driver's ability to perform his job.  (Henning Dep. 55-56.)

Tomlinson returned to work full time driving and unloading without any helpers.  (Tomlinson Dep. 99-100.)  Tomlinson asserts that J.B. Hunt required him to lift more than 60 pounds, beginning on his first day back at work.  (Tomlinson

Dep. 203, 215-16.)  He repeatedly complained about being required to violate his 60-pound restriction, but J.B. Hunt manager Thomas just told him that it was part of the job.  (Tomlinson Dep. 203-04.)

During his deposition, Henning testified that he did not know whether or not Tomlinson had a permanent 60-pound lifting restriction.  (Henning Dep. 51-52, 54-55, 128.)  On July 29, 2011, Kathy Tuff, Tomlinson's qualified rehabilitation consultant ("QRC"), faxed Henning a report of workability stating that Tomlinson had unspecified permanent weight and activity restrictions.  (Kitzer Decl., Ex. 10 at 3-4.)  Meleia Knight, Defendant's director of workers' compensation claims, emailed Henning on July 29, 2011 stating, "Since [Tomlinson] has been released back to his prior restrictions, which he passed his DOT prior to return to JBH, then he is cleared again from WC.  Let us know if he passes his DOT again or not."  (Id. at 1.)

Tomlinson testified that, after his injury, Henning complained that he had to pay $20,000 out of his budget because of Tomlinson's workers' compensation injury.  (Tomlinson Dep. 112-13.)  Henning made these complaints multiple times.  (Id. 113.)  He made these comments about every employee who got injured at work.  (Id. 114.)

### 5.    Workers' Compensation Claim for First Injury

Tomlinson filed a workers' compensation claim to cover his medical expenses after his first injury.  (Tomlinson Dep. 217.)  J.B. Hunt submitted the claim to its workers' compensation carrier and the carrier accepted liability and paid the benefits owed to Tomlinson.  (Id.)

On approximately November 11, 2011, Henning told Tomlinson that if he did not get his lawyer and QRC "to back off it would not go well for [Tomlinson]."  (Tomlinson Dep. 219, 225.)  When Tomlinson asked him to explain, Henning repeated the warning: "if you don't get your lawyer and QRC to back off on trying to put more liability on J.B. Hunt, it's not going to go well for you, Justin and Gabe are getting tired of it."  (Id.)

### 6.    Tomlinson's Second Injury

On January 17, 2012, Tomlinson injured his right rotator cuff when he tried to loosen a ramp that was wedged between appliances and the wall of his trailer. (Tomlinson Dep. 29-30, 109.)  He reported the injury to Henning that day.  (Id. 109.)  Henning asked Tomlinson if he had reported it to his workers' compensation attorney and QRC yet.  (Id. 109-110.)  Tomlinson said he would.

(Id. 110.)  Henning then told him to continue work and let him know how the pain was later in the day.  (Id.)

On January 19, 2012, Tomlinson's doctor put him on a two-week leave. (Tomlinson Dep. 115.)  That same day, Tomlinson told Henning that he was cleared to return to work on February 6; he also gave Henning the doctor's note saying that he could return to work with the same 60-pound overhead lifting restriction.  (Id. 116-17.)  Sanders later told Tomlinson that he could not take the DOT physical because Hill wanted new restrictions.  (Id. 117-18.)

Hill asked that Tomlinson and his physician clarify if there were new work restrictions for the new injury.  (Hill Dep. 64-65, 68-70; Kitzer Decl., Ex. 13.)  On February 10, 2012, Tomlinson's doctor released him to return to work at J.B. Hunt subject to the same 60-pound overhead lifting restriction that had previously been in place.  (Tomlinson Dep. 115-17; Kitzer Decl., Ex. 13.)  Specifically, under the category "Able to stow cartons and merchandise weighing up to 60 lbs overhead," the doctor wrote: "occasionally with right arm[;] able to do with using right & left arm together."  (Kitzer Decl., Ex. 13.)  Hill testified that, after Tomlinson's physician provided the February 10 restriction, Tomlinson was "released back to his manager for the determination if they needed [a DOT

physical]." (Hill Dep. 70-71.) Hill testified that she was not involved in the decision of whether Tomlinson needed a DOT physical and that she was not aware of any reason why he was not able to return to work at that point. (Id.) Tomlinson testified that Henning told him that Hill made the decision that he could not come back to work. (Tomlinson Dep. 165-67.)

Tomlinson testified that, when he reported his second injury to Henning on January 19, Henning responded: "I hope this is part of the first injury so you don't cost me another $20,000." (Tomlinson Dep. 220.) In fact, however, Tomlinson's second injury was considered a new injury, not a re-injury of his first work injury. (Id. 226.)

Tomlinson's QRC called and emailed Hill to inquire about Tomlinson returning to work at J.B. Hunt, but Hill did not respond. (Tomlinson Dep. 165; Kitzer Decl., Ex. 16.) Tomlinson testified that Henning told him that Hill had made the decision that Tomlinson could not return to work. (Tomlinson Dep. 164-65.) Hill testified that it was possible for Tomlinson to be given light duty work after his second injury, but that it was Henning's decision whether light duty work was available. (Hill Dep. 76-78.)

On February 20, 2012, Hill sent Henning an email stating that Tomlinson had been cleared to return to work as a driver with a full release effective February 7, 2012, and that he could drive, load, and unload with no restrictions. (Hill Dep. 76; Kitzer Decl., Ex. 14 at 1.)  The email explained that there had been a delay in obtaining the clearance because Hill had to obtain a corrected release from the physician.  (Kitzer Decl., Ex. 14 at 1.)  Although Hill and Henning discussed possible light duty positions for Tomlinson after his first injury, they did not do so after his second injury.  (Hill Dep. 78-79.)

### 7.     Termination

Henning told Tomlinson that Hill made the decision that Tomlinson was not allowed to return to work.  (Tomlinson Dep. 165.)  Henning swore that he did not make the decision to terminate Tomlinson.  (Henning Dep. 79-80, 125.) He testified that he simply received an email directing him to terminate Tomlinson in the "system," and he cannot recall who sent the email, but thinks that it was the benefits department or workers' compensation department. (Henning Dep. 79, 125.)  He coded Tomlinson's termination as "quit" even though Tomlinson had not quit, because that was the option for "failure to return from leave."  (Henning Dep. 93-95; Kitzer Decl., Ex. 19.)  In J.B. Hunt's

interrogatory responses, it only identified one J.B. Hunt employee as having knowledge relating to Tomlinson's allegations: Henning.  (Kitzer Decl., Exs. 20-22.)

Hill testified that she did not know that Tomlinson was terminated until someone notified her after the fact.  (Hill Dep. 79.)  Sanders also testified that he had nothing to do with the decision to terminate Tomlinson and learned about the termination through word of mouth.  (Sanders Dep. 27.)

J.B. Hunt never allowed Tomlinson to return to work after his second injury and terminated him on March 9, 2012.  (Tomlinson Dep. 119.)  Defendant informed him that he had used up all of his personal leave time, so he was terminated.  (Id.; Kitzer Decl., Ex. 18, Feb. 2, 2012 Letter from J.B. Hunt to Tomlinson (informing him that he would be terminated if he did not return to work by March 9, 2012).)  Tomlinson wanted to return to work and thought that he was able to do every aspect of his driver job other than lifting more than 60 pounds overhead.  (Tomlinson Dep. 123, 161.)

On approximately March 25, 2012, Tomlinson returned to J.B. Hunt's Roseville facility to clean out his truck.  (Tomlinson Dep. 227.)  He told Henning,

"I guess since I didn't get my lawyer and QRC to back off it didn't go well for me."  (Id. 219-20.)  Henning responded, "[Y]ep, I guess."  (Id. 220.)

Tomlinson had surgery on his shoulder on April 25, 2012.  (Tomlinson Dep. 170-71.)  He was unable to work after the surgery until February 11, 2013.  (Id.)  Since February 11, 2013, his work restrictions are limited to lifting 10 pounds from floor to waist, five pounds from waist to shoulder, and one pound overhead.  (Tomlinson Dep. 33, 170-71.)  Tomlinson was totally disabled from working in 2012 and admits that he had limitations that prevented him from working as a driver.  (Id. 181-82.)

### 8.    Bradley Johnson

Bradley Johnson worked as a driver with Tomlinson at J.B. Hunt's Roseville facility until December 2010.  (Kitzer Decl., Johnson Dep. 12-14, 33.)  He has also brought a lawsuit against J.B. Hunt for workers' compensation retaliation.  Johnson v. J.B. Hunt Transport, Inc., Civil File No. 12-2031 (MJD/TNL).  Johnson and Tomlinson were both employees who were underneath Henning's supervision who filed more than one workers' compensation claim; both were terminated.  (Kitzer Decl., Ex. 22, Interrog. No. 9; Kitzer Decl., Ex. 23 at 3-7.)

18

### B.      Procedural History

On July 31, 2012, Tomlinson commenced an action against J.B. Hunt in

Minnesota State Court, Ramsey County.  On August 20, 2012, J.B. Hunt removed

the matter to this Court based on diversity jurisdiction.  On November 13, 2012,

Tomlinson filed a Second Amended Complaint ("SAC") alleging: Count 1:

Workers' Compensation Retaliation, Minnesota Statute § 176.82; and Count 2:

Disability Discrimination in Violation of the Minnesota Human Rights Act

("MHRA").  Tomlinson agrees to dismiss Count 1 to the extent it is based on an

obstruction of benefits claim.  (Pl.'s Opp. at 38.)

J.B. Hunt now moves for summary judgment on both claims against it.

Tomlinson requests that the Court strike the declaration of Defendant's witness

Wesley Griffin.

## III.   DISCUSSION

### A.      Motion to Strike Declaration of Wesley Griffin

Tomlinson moves to strike the declaration of Wesley Griffin, cited by

Defendant in support of its Motion for Summary Judgment.

#### 1.      Facts Related to the Griffin Declaration

On May 31, 2013, in the related case of Johnson v. J.B. Hunt Transport, Inc.,

Civil File No. 12-2031 (MJD/TNL), J.B. Hunt filed a declaration by Wesley Griffin,

its Litigation Director. [Docket No. 33] J.B. Hunt relies on the Griffin Declaration

in this case as well. The Griffin Declaration contains background information

regarding J.B. Hunt's policies and procedures.

Tomlinson asserts that Griffin was never identified as a person with any

knowledge about the case in Defendant's Rule 26(a) Disclosures, in response to

written discovery asking Defendant to identify all persons with information

relating to the allegations in the lawsuit, in any depositions, or at any point

before the Motion for Summary Judgment was filed. (Kitzer Decl., Exs. 1-3.)

Defendant admits that it did not include Griffin in its Rule 26(a) disclosure

of "Names of Individuals Likely to Have Discoverable Information." (Kitzer

Decl., Ex. 1.) However, Griffin verified J.B. Hunt's responses to Tomlinson's

interrogatories on January 31, 2013. (Kitzer Decl., Ex. 2.) And, in response to

Interrogatory No. 1, asking J.B. Hunt to identify each person who provided

information, was consulted, or participated in the preparation of the answers to

the Interrogatories, J.B. Hunt "refers to the verification page" signed by Griffin

and identifying him as "Director of Claims Administration for J.B. Hunt." (Id.)

Defendant concludes that Tomlinson was on notice that Griffin had relevant

information about the topics in the interrogatory responses, including J.B. Hunt's

operations, policies, and practices – the same topics addressed in the Griffin

Declaration.  However, Tomlinson did not attempt to depose Griffin.  (Wood

Decl. ¶ 3.)

## 2.    Legal Standard

Federal Rule of Civil Procedure 26(a)(1)(A)(i) requires a party to provide to

the other parties: "the name and, if known, the address and telephone number of

each individual likely to have discoverable information – along with the subjects

of that information – that the disclosing party may use to support its claims or

defenses, unless the use would be solely for impeachment."  Parties also have a

continuing duty to supplement or correct all Rule 26(a) disclosures, interrogatory

responses, and requests for production if their responses are either incomplete or

incorrect, "if the additional or corrective information has not otherwise been

made known to the other parties during the discovery process or in writing."

Fed. R. Civ. P. 26(e)(1).

Rule 37 states that a party who fails to provide information or identify

witnesses as required under Rule 26(a) or fails to supplement as required under

Rule 26(e)(1) "is not allowed to use that information or witness to supply

evidence on a motion, at a hearing, or at trial, unless the failure was substantially

justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  "Rule 37 does not provide for

mandatory sanctions, and the district court may find that a party's failure to

include a witness in the initial Rule 26(a)(1) disclosures was substantially

justified or harmless."  Davis v. U.S. Bancorp, 383 F.3d 761, 765 (8th Cir. 2004).

> When a party fails to provide information or identify a witness in
> compliance with Rule 26(a) or (e), the district court has wide
> discretion to fashion a remedy or sanction as appropriate for the
> particular circumstances of the case.  The district court may exclude
> the information or testimony as a self-executing sanction unless the
> party's failure to comply is substantially justified or harmless.  When
> fashioning a remedy, the district court should consider, inter alia,
> the reason for noncompliance, the surprise and prejudice to the
> opposing party, the extent to which allowing the information or
> testimony would disrupt the order and efficiency of the trial, and the
> importance of the information or testimony.

Wegener v. Johnson, 527 F.3d 687, 692 (8th Cir. 2008) (citations omitted).

### 3.    Analysis of the Alleged Failure to Disclose

Tomlinson had notice of Griffin's knowledge of Defendant's policies,

procedures, and documents based on the January 31, 2013 interrogatory response

and verification.  See Brown v. Chertoff, No. 406CV002, 2009 WL 50163, at *5-6

(S.D. Ga. Jan. 7, 2009) (holding declarants were sufficiently revealed when, in

response to interrogatories, party wrote that the two declarants "provided the

information necessary to answer this interrogatory"), aff'd 380 Fed. App'x 832

(11th Cir. 2010).  There is no requirement to supplement if the information was

otherwise made known to the opposing party during the discovery process.  Fed.

R. Civ. P. 26(e)(1).  Thus, Plaintiff's motion to strike Griffin's declaration based on

the failure to disclose is denied.

### 4.      Foundation

Tomlinson also asserts that the declaration should be stricken because it

lacks foundation.  In Griffin's declaration, Griffin explains that, as Litigation

Director for J.B. Hunt, he has personal knowledge of its operations, corporate

structure, and related issues.  (Griffin Decl. ¶ 1.)  He refers to company policies

and procedures produced in this litigation.  (Id. ¶¶ 7, 10.)  Plaintiff has presented

no evidence to show that Griffin lacks foundation to provide the opinions that he

did.  Nor does Tomlinson challenge the accuracy of Griffin's statements.  Griffin

avers that he has personal knowledge of J.B. Hunt's policies based on his position

within the company, so foundation has been established.  Plaintiff's motion to

strike Griffin's declaration based on lack of foundation is denied.

### B.      Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most

favorable to the non-moving party, there is no genuine dispute as to any material

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no disputed issue

of material fact.  Celotex, 477 U.S. at 323.  "A dispute is genuine if the evidence is

such that it could cause a reasonable jury to return a verdict for either party; a

fact is material if its resolution affects the outcome of the case."  Amini v. City of

Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248, 252 (1986)).

    **C.**    **Workers' Compensation Retaliation**

        **1.**    **Standard for Workers' Compensation Retaliation**

Minnesota Statute § 176.82, subdivision 1, provides:

> Any person discharging or threatening to discharge an employee for
> seeking workers' compensation benefits or in any manner
> intentionally obstructing an employee seeking workers'
> compensation benefits is liable in a civil action for damages incurred
> by the employee . . . .

        **2.**    **Direct Evidence and McDonnell Douglas Standards**

The parties debate whether the Court should apply the direct evidence

standard of analysis or the McDonnell Douglas standard of analysis to Plaintiff's

workers' compensation claim.  The Court need not resolve the question because,

under either method of analysis, Plaintiff's claim survives summary judgment.

### a)      Direct Evidence Standard

"Direct evidence is evidence showing a specific link between the alleged

discriminatory animus and the challenged decision, sufficient to support a

finding by a reasonable fact finder that an illegitimate criterion actually

motivated the adverse employment action."  King v. United States, 553 F.3d 1156,

1160 (8th Cir. 2009) (citation omitted).  Direct evidences includes "evidence of

actions or remarks of the employer that reflect a discriminatory attitude,

comments which demonstrate a discriminatory animus in the decisional process,

or comments uttered by individuals closely involved in employment decisions."

Id. at 1161 (citation omitted).  "[S]tray remarks in the workplace, statements by

nondecisionmakers, and statements by decisionmakers unrelated to the

decisional process do not constitute direct evidence."  Id. at 1160 (citations

omitted).

### b)      McDonnell Douglas Standard

A workers' compensation retaliation claim is generally analyzed under the

McDonnell Douglas burden-shifting test.  See Randall v. N. Milk Prods., Inc., 519

N.W.2d 456, 459 (Minn. Ct. App. 1994).  "A prima facie case of retaliatory

discharge under Minnesota law consists of: (1) statutorily-protected conduct by

the employee; (2) adverse employment action by the employer; and (3) a causal

connection between the two." Kunferman v. Ford Motor Co., 112 F.3d 962, 965

(8th Cir. 1997) (citation omitted). For the purposes of this motion, the parties

agree that Tomlinson engaged in protected conduct by seeking workers'

compensation benefits and suffered an adverse employment action when he was

terminated. Only the causation prong remains at issue.

> If the plaintiff establishes the prima facie case,
>
> the burden of production then shifts to the employer to articulate a
> legitimate reason for the discharge; and [] if the employer articulates
> a legitimate reason, the burden of production shifts back to the
> plaintiff to show pretext and the factfinder must determine whether
> the illegitimate reason (i.e., seeking workers' compensation benefits)
> was more likely than not the reason for discharge.

Benson v. Nw. Airlines, Inc., 561 N.W.2d 530, 539 (Minn. Ct. App. 1997) (citation

omitted).

### 3.    Analysis

Viewing the evidence in the light most favorable to Plaintiff, there is ample

evidence of discriminatory animus to enable his claim to survive summary

judgment, whether the claim is viewed under the direct evidence standard or

through the lens of causation and pretext under the McDonnell Douglas

standard. Henning was Tomlinson's supervisor and entered his termination into

the system.  He was the person with the authority to decide whether or not to give Tomlinson light duty work.  Although Henning denies making the termination decision, Defendant offers no evidence of who did make that decision, so a reasonable jury could conclude that Henning was involved.

Henning made comments such as complaining about $20,000 coming out of his budget because of Plaintiff's workers' compensation injuries; after Tomlinson's second injury, Henning stated that he hoped the injury was part of the first injury so that it would not cost him another $20,000 and, in fact, the injury was considered a separate injury; Henning told Tomlinson to have his workers' compensation lawyer and QRC "back off" and threatened that it would not go well for Tomlinson if he disobeyed; and after Tomlinson was fired, Henning agreed that it did not go well for Tomlinson because Tomlinson failed to get his lawyer and QRC to "back off."  Additionally, Henning made clear, through his comments and actions, that he was displeased with Tomlinson's injuries.  For example, after Tomlinson's first injury, Henning got upset when Tomlinson could not work and directed Tomlinson to return to his doctor and get permission to work rather than take the medically directed two weeks off.

Taken together, the foregoing evidence is sufficient to support a finding that Henning based the decision to terminate Tomlinson on discriminatory animus.

Moreover, Tomlinson points to evidence that Johnson was also fired after making his second workers' compensation claim.  See Estes v. Dick Smith Ford, Inc., 856 F.2d 1097, 1103 (8th Cir. 1988) (noting that "unflattering testimony about the employer's history and work practices" "may be critical for the jury's assessment of whether a given employer was more likely than not to have acted from an unlawful motive"), overruled in part on other grounds by Price Waterhouse v. Hopkins, 490 U.S. 228 (1989).  Here, Henning was the supervisor for both Johnson and Tomlinson, so evidence of Henning's comments about Johnson are "probative of [Defendant's] intent to discriminate."  Goldsmith v. Bagby Elevator Co., Inc., 513 F.3d 1261, 1286 (11th Cir. 2008).  Thus, Tomlinson's claim is further supported by evidence that, for example, after Johnson's second workers' compensation claim, Regional Safety Director Ron Schey allegedly stated that Johnson was becoming a liability for J.B. Hunt and Henning agreed with that comment (Tomlinson Decl. ¶ 3; Johnson Dep. 88, 98-100, 104-06); and that while Johnson was on leave after his second injury, Henning stated, "I can't wait to push that button on Brad, it's so close," and, after Johnson was

28

terminated, Henning bragged to him, "Yep, I finally did it.  I pushed the button

on Brad." (Tomlinson Decl. ¶¶ 1-2).

The Court rejects Defendant's assertion that Schey's comment and

Henning's response are hearsay.  These comments are admissible statements by a

party opponent – Schey's and Henning's statements were made during their

employment and related to their jobs as supervisors.  Also, the statements are

relevant because there is evidence that Henning made the decision to fire

Johnson and Tomlinson, and Henning agreed with Schey's statement.

### 4.    Pretext

Although Defendant has set forth a legitimate reason for Tomlinson's

termination – that it terminated Tomlinson because he had exhausted all

available leave allowed under Defendant's leave policies – Tomlinson has

presented sufficient evidence to show pretext.

> An employee may prove pretext by demonstrating that the
> employer's proffered reason has no basis in fact, that the employee
> received a favorable review shortly before he was terminated, that
> similarly situated employees who did not engage in the protected
> activity were treated more leniently, that the employer changed its
> explanation for why it fired the employee, or that the employer
> deviated from its policies.

Stallings v. Hussmann Corp., 447 F.3d 1041, 1052 (8th Cir. 2006) (citations

omitted).

The evidence Tomlinson presented in support of the causation prong and

in support of the direct analysis also supports a finding of pretext.  Moreover, the

fact that J.B. Hunt refuses to identify the person responsible for terminating

Tomlinson is strong evidence of pretext.  Hill declared that it was not her

decision to fire Tomlinson and that Henning made the decision to not order a

DOT test and to not provide light duty work.  Henning testified that Hill's

department directed him to terminate Tomlinson.  "A jury could reasonably

determine that [plaintiff's] supervisors' game of 'hot potato' was an attempt to

dissemble for discrimination." Zacharias v. Guardsmark, LLC, Civ. No. 12–174

(RHK/FLN), 2013 WL 136240, at *6 (D. Minn. Jan. 10, 2013).

Additionally, viewing the evidence in the light most favorable to

Tomlinson, J.B. Hunt applied its leave policy inconsistently to him, which could

be interpreted as evidence of pretext.  Henning and Hill admitted that Tomlinson

was previously allowed to stay on light duty beyond the six-month limitation

after his first workers' compensation claim, which could demonstrate that the

termination policy is not strictly enforced.  Yet Defendant completely refused to

provide Tomlinson with a light duty position after his second injury. Additionally, there is evidence that the decision of whether to offer Tomlinson light duty was entirely up to Henning, and he had no objective criteria to guide his decision.  Although Henning testified that he had never attempted to find light duty work at an employee's request, the February 26, 2010, email from Henning demonstrates that Henning did, in the past, advocate for finding light duty work for an injured employee.  Overall, the record reflects a genuine issue of fact regarding whether J.B. Hunt terminated Tomlinson in retaliation for his filing of his second workers' compensation claim.

### D.     Workers' Compensation Continued Employment Claim

### 1.     Standard for Workers' Compensation Continued Employment Claim

Minnesota Statute § 176.82, subdivision 2, provides:

> An employer who, without reasonable cause, refuses to offer continued employment to its employee when employment is available within the employee's physical limitations shall be liable in a civil action for one's wages.  . . .  In determining the availability of employment, the continuance in business of the employer shall be considered and written rules promulgated by the employer with respect to seniority or the provisions o[f] any collective bargaining agreement shall govern.

Tomlinson argues that a jury can conclude that J.B. Hunt could have provided him a light duty position after his second injury or returned him to his previous driver position.

### 2.    Analysis

Tomlinson does not argue that there were any particular light duty positions within J.B. Hunt for which he should have been hired in February and March 2012.  Rather, he argues that J.B. Hunt is liable because it made no effort to find light duty work for him in general.   Alternatively, he argues that, as of February 2012, he was able to do the same driver job he had done before because his only restriction was the same 60-pound overhead lifting restriction that he had previously had when he worked as a driver.

Defendant argues that it is Plaintiff's burden to prove that a light duty position existed in February 2012 that was available to him within his physical limitations.  See Johnson v. Otter Tail Cnty., No. Civ.A. 98-2237(RLE), 2000 WL 1229854, at *18 (D. Minn. July 24, 2000), aff'd 2001 WL 664217 (8th Cir. June 14, 2001).  Defendant concludes that, because Tomlinson has not identified a particular available position for which he was qualified, his claim fails.

The Court denies summary judgment on the continued employment aspect of Plaintiff's workers' compensation claim. This case is unusual in that Defendant admittedly created short-term light duty positions for injured employees and had done so for Tomlinson and Johnson in the past. These are not pre-existing job openings. Rather, viewing the evidence in the light most favorable to Tomlinson, Henning invented positions out of whole cloth if he wished to keep a particular driver employed. Additionally, Defendant admits that there is no clear policy regarding who will be given light duty, when light duty work is available, or the responsibilities of any light duty job. And, here, none of Defendant's employees will admit to making the decision to deny light duty work to Tomlinson after his second injury, let alone explain their reasoning. Under these circumstances, combined with the previously discussed evidence supporting Plaintiff's subdivision 1 claim, there is sufficient evidence to permit this claim to continue to trial.

Alternatively, Tomlinson has presented sufficient evidence to show that J.B. Hunt should have allowed him to return to his former driver job until his April 2012 surgery. As of February 2012, Johnson was only subject to the 60-pound overhead lifting restriction, and J.B. Hunt had previously allowed him to

work as a driver with that same restriction.  As of February 2012, Hill had

informed Henning that Tomlinson had been cleared to return to work as a driver

with a full release, subject to Henning's decision on whether a DOT physical was

needed.  J.B. Hunt has not shown any legitimate reason that Tomlinson was not

permitted to return to work as a driver at that time.

### E.      Workers' Compensation Threat of Discharge Claim

The Court holds that Plaintiff has alleged no separate "threat of discharge"

claim under subdivision 1.  Rather, the issue of allegedly threatening discharge is

part of the overall subdivision 1 retaliation claim.  As the Court has previously

explained, Tomlinson's retaliation claim survives summary judgment.

### F.      Disability Discrimination

### 1.      Minnesota Human Rights Act Standard

Tomlinson asserts that J.B. Hunt engaged in unfair employment practices

under the MHRA based on his disability.  See Minn. Stat. § 363A.08.

> "Disability" means any condition or characteristic that renders a
> person a disabled person.  A disabled person is any person who (1)
> has a physical, sensory, or mental impairment which materially
> limits one or more major life activities; (2) has a record of such an
> impairment; or (3) is regarded as having such an impairment.

Minn. Stat. § 363A.03, subd. 12.

34

## 2.    Whether Tomlinson Was Disabled

Defendant argues that Tomlinson cannot show that he was disabled at the time he was terminated.  Defendant first argues that Tomlinson is bound by his deposition testimony that he did not become disabled until April 25, 2012, after his employment had already been terminated.  (Tomlinson Dep. 35-36, 160-61.) The Court holds that Tomlinson is not bound by his deposition testimony that his disability began in April 2012, after he was terminated, because "disability" is a legal term that was not defined for him during the deposition.  See Bourgo v. Canby Sch. Dist., 167 F. Supp. 2d 1173, 1182 (D. Or. 2001).

Despite the fact that Tomlinson is not bound by his alleged admission that his disability arose in April 2012, the Court holds that the record reflects that Tomlinson was not disabled at the time that he was terminated.  At the time of Tomlinson's termination, his only restriction was that he could not lift more than 60 pounds over his head.  (See Tomlinson Dep. 116; Kitzer Decl., Ex. 13, February 10, 2012 Physician Assessment at 4 (providing that Tomlinson's only restriction was in the category of "Able to stow cartons and merchandise weighing up to 60 lbs overhead," and the restriction was "occasionally with right arm[;] able to do with using right and left arm together"); id. (providing that Tomlinson could, without restriction, "lift 100 lb containers over 4 feet high").)

35

Tomlinson's 60-pound overhead limitation cannot constitute a material limitation of the major life activity of working, because there is no evidence that lifting 60 pounds overhead is a requirement for a broad class of jobs. See St. Martin v. City of St. Paul, 680 F.3d 1027, 1032-33 (8th Cir. 2012) (holding plaintiff could not show he was disabled under the Americans with Disabilities Act ("ADA") because his knee injury did not substantially limit his ability to work a broad class of jobs). And, in fact, Tomlinson's physician released him to work as his previous J.B. Hunt driver job. Nor has Tomlinson presented evidence that he was regarded as disabled based on the 60-pound overhead restriction. He had the same restriction when he was cleared to return to work after his first injury and did work after his first injury, when he was cleared for work after his second injury, and at the time of his termination.

Nor can Tomlinson's restriction constitute a material limitation of the major life activity of lifting because "the capacity to perform heavy lifting is not a trait shared by the majority of the population. Otherwise, the ranks of the disabled would swell to include infants, the elderly, the weak, and the out-of-shape." Murray v. Warren Pumps, LLC, Civil Action No. 11–40176–DPW, 2013 WL 5202693, at *7 (D. Mass. Sept. 12, 2013) (noting that, under Massachusetts

MHRA equivalent, "lifting" is a "major life activity" but concluding that "heavy lifting" does not constitute such an activity). Tomlinson has offered no evidence that his lifting restriction was any worse that the abilities of the rest of the adult population. Given that, according to the uncontested medical evidence, Tomlinson could still lift 100 pounds over 4 feet high without restriction and could lift 60 pounds overhead if he used both arms, it would be incongruous to hold that he was materially limited in the major life activity of lifting. On the record before the Court, Tomlinson cannot show that he was disabled. Therefore, his disability claim under the MHRA must be dismissed.

Accordingly, based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED**:

1. Defendant's Motion for Summary Judgment [Docket No. 40] is **GRANTED IN PART** and **DENIED IN PART** as follows: Count 1: Workers' Compensation Retaliation, Minnesota Statute § 176.82 **REMAINS**; and Count 2: Disability Discrimination in Violation of the Minnesota Human Rights Act is **DISMISSED**.

2. Plaintiff's Motion to Strike Declaration of Wesley Griffin [Docket No. 48] is **DENIED**.

Dated:   December 19, 2013            s/ Michael J. Davis
                                     Michael J. Davis
                                     Chief Judge
                                     United States District Court